FILED

2005 Jul-05  PM 03:13
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | |
|---|---|
| **KENYATTA L. THAMES** | ] |
| **PLAINTIFF,** | ] |
| | ] |
| **v.** | ]**Case No.** |
| | ]**CV-04-1107-VEH** |
| | ] |
| | ] |
| **BIRMINGHAM AIRPORT AUTHORITY,** | ] |
| **DEFENDANT.** | ] |
| | ] |

## Opinion

This Court has before it the April 15, 2005, motion of Defendant Birmingham Airport Authority ("BAA") for summary judgment as to Plaintiff Kenyatta L. Thames's claims. (Doc. 21)

### I. Procedural History

Plaintiff Kenyatta L. Thames commenced this action on May 28, 2004, by filing a complaint in this Court alleging violations of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e et seq., the Civil Rights Act of 1991, and 42 U.S.C. § 1981a. Plaintiff Thames alleges in her complaint that she was subjected to unwelcome acts of sexual harassment by her immediate supervisor.

1

Plaintiff Thames contends that when she exercised her statutory rights by complaining to Defendant BAA regarding the sexual harassment,  she was subjected to retaliation.  On April 15, 2005, the Defendant filed a motion for summary judgment asserting: (1) that Plaintiff Thames  has failed to establish prima facie cases of sexual harassment and retaliation; (2) that the Defendant is entitled to summary judgment as to Plaintiff's Title VII claim of sexual harassment on the grounds that it has invoked an affirmative defense; (3) that even if Plaintiff Thames  has established a prima facie case as to her retaliation claim, Plaintiff Thames  has failed to rebut the Defendant's legitimate, non-discriminatory, and non-retaliatory reasons for its employment decision; and (4) that Plaintiff Thames's sexual harassment claim is barred by Alabama Code §4-3-50.

The Defendant has submitted evidence[1]  in support of its motion for summary judgment and filed a supporting brief on April 15, 2005.  On May 6, 2005, the Plaintiff filed a brief and evidence in opposition to the Defendant's motion for summary judgment.  The Defendant filed a reply brief on May 20, 2005.

---

[1] The Defendant submitted the depositions of Plaintiff Kenyatta L. Thames and Mike Thompson. The Defendant also submitted declarations by Leslie Murray, Ella Hardy, Janice Lavender, Barbara Patterson, Edwina Wells, and Patricia Ann Williams.  References to the deposition transcripts are denoted by the last name of the deponent, followed by the abbreviation "Dep.," followed by the page number of the deposition transcripts being referenced.

## II.  Standard of Review

### A.  Summary Judgment

Under Federal Rule of Civil Procedure 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Chapman v. AI Transport, 229 F.3d 1012, 1023 (11th Cir. 2000).  The party asking for summary judgment always bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of the pleadings or filings which it believes demonstrate the absence of a genuine issue of material fact.  Celotex Corp., 477 U.S. at 323. Once the moving party has met his burden, Rule 56(e) requires the nonmoving party to go beyond the pleadings and by his own affidavits, or by the depositions, answers to interrogatories, and admissions of file, designate specific facts showing that there is a genuine issue for trial.  Id. at 324.

The substantive law will identify which facts are material and which are irrelevant.  Chapman, 229 F.3d at 1023; Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  All reasonable doubts about the facts and all justifiable inferences are resolved in favor of the non-movant.  Chapman, 229 F.3d at 1023;

<u>Fitzpatrick v. City of Atlanta</u>, 2 F.3d 1112, 1115 (11th Cir. 1993).  A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." <u>Anderson</u>, 477 U.S. at 248; <u>Chapman</u>, 229 F.3d at 1023.  If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted.  <u>Anderson</u>, 477 U.S. at 249.

The method used by the party moving for summary judgment to discharge its initial burden depends on whether that party bears the burden of proof on the issue at trial.  <u>See</u> <u>Fitzpatrick</u>, 2 F.3d at 1115-17 (citing <u>United States v. Four Parcels of Real Property</u>, 941 F.2d 1428 (11th Cir. 1991)(<u>en banc</u>)).  If the moving party bears the burden of proof at trial, then it can only meet its initial burden on summary judgment by coming forward with positive evidence demonstrating the absence of a genuine issue of material fact; i.e. facts that would entitle it to a directed verdict if not controverted at trial.  <u>Fitzpatrick</u>, 2 F.3d at 1115.  Once the moving party makes such a showing, the burden shifts to the non-moving party to produce significant, probative evidence demonstrating a genuine issue for trial.

If the moving party does not bear the burden of proof at trial, it can satisfy its initial burden on summary judgment in either of two ways.  First, the moving party may produce affirmative evidence negating a material fact, thus demonstrating that the non-moving party will be unable to prove its case at trial.

4

Once the moving party satisfies its burden using this method, the non-moving party must respond with positive evidence sufficient to resist a motion for directed verdict at trial. The second method by which the moving party who does not bear the burden of proof at trial can satisfy its initial burden on summary judgment is to <u>affirmatively</u> show the absence of evidence in the record to support a judgment for the non-moving party on the issue in question. This method requires more than a simple statement that the non-moving party cannot meet its burden at trial but does not require evidence negating the non-movant's claim; it simply requires the movant to point out to the district court that there is an absence of evidence to support the non-moving party's case. <u>Fitzpatrick</u>, 2 F.3d at 1115-16. If the movant meets its initial burden by using this second method, the non-moving party may either point out to the court record evidence, overlooked or ignored by the movant, sufficient to withstand a directed verdict, or the non-moving party may come forward with additional evidence sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency. However, when responding, the non-movant can no longer rest on mere allegations, but must set forth evidence of specific facts. <u>Lewis v. Casey</u>, 518 U.S. 343, 358 (1996) (citing <u>Lujan v. Defenders of Wildlife</u>, 504 U.S. 555, 561 (1992)).

### III. Relevant Facts[2]

1. BAA hired Plaintiff as an Operations Specialist on October 21, 2002 and assigned her to the third shift from 10:00 P.M. to 6:00 A.M.[3] Thames Dep. 11-12,109, DX 4.

2. At the commencement of Plaintiff Thames's employment, Leslie Murray ("Murray"), human resources administrator, and Partricia Williams ("Williams"), human resources administrative clerk, met with Plaintiff Thames. Thames Dep. 118. One of the women (it may have been Williams) reviewed paperwork, job responsibilities, benefits, salary, and safety measures with Plaintiff Thames. Thames Dep. 112, 118-119, 114-116, 126-128, 140-141.

3. Plaintiff Thames cannot recall Williams going over new hire paperwork with her. Thames Dep. 114. Although Plaintiff Thames recalls receiving safety information, she does not recall receiving the BAA personnel policy manual

---

[2] Pursuant to Rule 56 of the Federal Rules of Civil Procedure, the facts are presented in the light most favorable to the Plaintiff. Facts are undisputed unless otherwise expressly noted.

[3] As an Operation Specialist, Plaintiff was responsible for maintaining a 24 hour surveillance operations center, directing vehicles on the terminal drive, responding to emergency calls, contacting appropriate emergency staff, fire, police, and/or FAA personnel, assisting in the enforcement of airfield security, responding to security breaches, and controlling access to secure areas. The operations center is set up so that two people are necessary for proper monitoring of all 32 camera monitors. Thames Dep. 251-253, 404; Murray Dec. ¶2.

including the BAA sexual harassment policy, or reviewing the employee orientation checklist materials.[4]  Thames Dep. 112, 114-115, 117-129, 133-136.  Nevertheless, Murray specifically told Plaintiff Thames during the orientation process to come directly to her with any questions or concerns. Thames Dep. 110; Murray Dec. ¶3.

4.      Plaintiff followed Murray's instructions and came to her within the first few weeks of her employment with questions concerning her benefits. Thames Dep. 143-44.

5.      A copy of the personnel policies manual containing BAA's sexual harassment policy and complaint procedure was usually accessible to all employees in the operations room. Wells Dec. ¶ 3, Murray Dec. ¶ 4. However, Plaintiff Thames testified that she could not initially locate the policy manual in the operations office.  Thames Dep. 153-159.  In addition, there was no sexual harassment policy posted within the operations area or break room.  Thames Dep. 168.  Once Plaintiff Thames found the personnel policies manual containing the sexual harassment policy, she reviewed it. Thames Dep. 159-160.

---

[4] Williams testified that she prepared the new hire materials and gave Plaintiff Thames a copy of the personnel policies manual which contains BAA's sexual harassment policy. Williams Dec.  ¶¶ 2, 4.

6.      In addition to the sexual harassment policy not being posted in the operations room and breakroom, Henderson, a supervisor and alleged harasser, was not provided training on the policy and procedure manual or sexual harassment policy.  Henderson Dep. 77-80.  He testified that he was instructed by BAA to read the policy.  Id.  Therefore, he was never trained by BAA.  Further, he testified that he does not recall seeing any videos on sexual harassment.  Id.  Henderson also testified that he did not know what the sexual harassment policy said, what it prohibits, and did not know the reporting procedures.  Henderson Dep. 117-119.

7.      On December 16, 2002, Plaintiff submitted a note to Murray claiming she had been sexually harassed by Nathaniel Henderson ("Henderson"), an operations supervisor.[5] Thames Dep. 165-166; DX 10.

8.      Plaintiff admits this was the first and only report of sexual harassment that she ever made to BAA.[6] Thames Dep. 165.

---

[5] Plaintiff claims that, shortly before reporting the alleged harassment to Murray, she called the 1-800 EAP/counseling number on two separate occasions. Thames Dep. 308-309. She testified that the first time she called she refused to give her name and work location. Thames Dep. 310. She also refused to make an appointment to talk with the counselor. Thames Dep. 310. The second time she called she gave her name and work information but still refused to make an appointment. Thames Dep. 310. She testified that she was advised by the EAP counselor to contact someone in Human Resources. Thames Dep. 310.

[6] Plaintiff admits she never attempted to report the harassment to anyone else in management prior to the time she went to Murray on December 16, 2002. Thames Dep.166.

9.      Plaintiff is not aware of any instance of alleged sexual harassment that was witnessed by management or human resources prior to December 16, 2002. Thames Dep. 313.  She is also not aware of any other reason why BAA's management should have known she was being subjected to alleged sexual harassment prior to her report of December 16, 2002. Id.

10.     However, Plaintiff Thames testified that Barbara Patterson witnessed some of the alleged acts of sexual harassment by Henderson.  Thames Dep. 307. Plaintiff Thames also asserts that she informed Edwina Wells of the alleged sexual harassment.[7]  Thames Dep. 153, 401.

11.     In her written statement, Plaintiff claimed that Henderson had asked her to date him on a few occasions, offered to loan her money, asked her what she wanted for Christmas, asked her what she would do if he kissed her, asked her why she spent so much time driving around with another male co-worker, and inappropriately touched her hand, shoulder, and leg on one

---

[7] Patterson and Wells testified in their sworn declarations that they have never witnessed Henderson act inappropriately toward Plaintiff Thames or any other female employees.  Wells Dec. ¶ 4; Patterson Dec. ¶3.  However, in her statement to BAA, Wells stated that she noticed Plaintiff Thames was "real nervous" and quiet when Henderson would come around.  PX 4.  As a result, she started to think that "something may not be right."  Id.  Wells also corroborated that Henderson had Plaintiff Thames ride with him and conduct the airfield inspection at least once, he had a practice of unexpectedly returning to the third shift after his shift had ended, and of returning to the third shift without swiping his identification badge. Id

occasion[8]. Thames Dep. 203-204, DX 15.

12.   It is undisputed that Murray promptly conducted a thorough investigation into Plaintiff's complaint. Thames Dep. 314, 321.

13.   During the investigation, Murray began working on the third shift to make Plaintiff more comfortable and to ensure that Henderson had no further contact with her. Thames Dep. 324, 391; Murray Dec. ¶ 6.

14.   As part of her investigation, Murray interviewed all third-shift operations employees as well as one operations employee from the second shift. Thames Dep. 315, 321; Murray Dec. ¶ 6.

15.   Plaintiff acknowledged that there was no one else that Murray should have spoken to who had knowledge concerning her allegations. Thames Dep. 321.

16.   On January 10, 2003, Murray issued her findings from the investigation. Thames Dep. 331; DX 17.

17.   Murray determined that the investigation was inconclusive as to whether unlawful sexual harassment had actually occurred. Thames Dep. 321.

18.   Nevertheless, she undertook measures to remedy any potential harassment and to eliminate Henderson's contact with Plaintiff. Thames Dep. 324, 325;

---

[8] Henderson touched the Plaintiff's leg and hand while riding in the car on an inspection.

DX 16.

19.   Specifically, Murray instructed Henderson to avoid all contact with Plaintiff Thames and not to communicate with her.  Thames Dep. 323-25; DX 16; Murray Dec. ¶ 7; Thompson Dep. 29.  Plaintiff Thames remained on her shift and Murray placed another supervisor (Thompson) into the vacant third shift supervisor slot.  Thames Dep. 323-324.

20.   BAA also instructed Henderson to leave work promptly when his shift ended at 9:00 P.M. and not to return to the facility during Plaintiff's shift (which commenced at 10:00 P.M.). Thames Dep. 324, 326.[9]

21.   Henderson was no longer permitted the flexibility of working different shifts. Murray Dec. ¶ 7.

22.   In addition, BAA's sexual harassment policy was reviewed, re-affirmed and re-distributed to Henderson. Pl. DX 16; Murray Dec. ¶ 7.

23.   Henderson was also warned that any further allegation(s) would be investigated and could result in his dismissal. Pl. DX 16; Murray Dec. ¶ 7.

24.   Within a year and several months following Plaintiff  complaints, BAA conducted sexual harassment training for all supervisors and managers and disseminated an updated sexual harassment policy and a confidentiality/anti-

---

[9]  Plaintiff and Henderson had always worked on different shifts.

11

retaliation policy. See Training and Anti-Harassment Policy
Acknowledgments of Mindingall, Wells, and Patterson, Exhibits 7 and 8;
and Confidentiality Policy Acknowledgment of Wells, Exhibit 9; Murray
Dec. ¶ 8.

25. Following Plaintiff's complaint to human resources, Plaintiff testified that
she was not further subjected to allege sexual harassment by Henderson
except on the occasion when she asked Henderson where a co-worker was
and he got angry and asked her why she needed to know. Thames Dep. 327-
28, 201-02, 407-08, 289-290.[10]

26. Following her complaint, there is only one occasion when Plaintiff had to
even work with Henderson, on February 7, 2003 when the federal
government elevated the national threat level from yellow to orange—and
Plaintiff admits that Henderson did not act inappropriately to her on this
occasion.[11] Thames Dep. 331; Murray Dec. ¶ 9.

---

[10]  Plaintiff testified as follows:
Q:    So after the time that you reported Mr. Henderson's sexual harassment to Leslie
Murray, you did not experience any sexual harassment, correct?
A:    That's correct.
[11]  Due to the extra security measures that had to be promptly implemented at the
airport, virtually all operations employees were called in to work. Murray Dec. ¶ 9. Under
the circumstances, the BAA could not avoid the fact that Henderson and Plaintiff would be
at work at the same time. Thames Dep. 330-31. Regardless, Plaintiff admitted that
Henderson did not engage in any inappropriate behavior on this occasion. Thames Dep. 327.

27.   On February 10, 2003, Plaintiff's counsel, Ann Robertson, contacted Murray and inquired why Plaintiff worked at the same time as Henderson on the previous Friday. Thames Dep. 343; Murray Dec. ¶ 10.

28.   Robertson also informed BAA that Plaintiff's co-workers had allegedly called her a liar and troublemaker. Murray Dec.¶ 10; Pl. DX 19.

29.   In response to this concern, BAA issued a letter to Plaintiff on February 14, 2003, explaining the unusual circumstances that led to her working at the same time as Henderson and to reiterate the action that was taken as a result of the investigation. Murray Dec. ¶ 10; Pl. DX 18.

30.   BAA reminded Plaintiff that on the rare instance when security measures required both her and Henderson to work together she was not required to have any contact with Henderson. Id.

31.   In response to Plaintiff Thames's January 3, 2003, complaints about her co-workers, BAA sent a memorandum dated February 25, 2003 to all operations employees reminding them of the confidential nature of all HR investigations and warned them that any retaliatory conduct would not be tolerated.  Thames Dep. 368; DX 19, 22; Murray Dec. ¶ 14.

32.   After the February 25, 2003, incident with Patterson, Plaintiff Thames stopped going to work because she believed it was not safe to continue

working at BAA.  Thames Dep. 33, 186-187, 190-191, 399-400.  Around this same time, Plaintiff and her husband decided to move to St. Louis. Thames Dep.  191.

33.   Following her decision to move to St. Louis, Plaintiff's attendance at work became less frequent and increasingly problematic. Murray Dec. ¶ 11.

34.   Plaintiff did not appear for work on February 11, 2003, and worked a total of only 5.5 hours on February 12, 2003.  Thames Dep. DX 20.

35.   She was absent the remaining days of that week either due to personal or family illness. Thames Dep. 347-48, DX 19.

36.   On Monday, February 17, 2003, Plaintiff reported off work because of "childcare" issues. Thames Dep.  DX 23.

37.   Despite the fact that she was familiar with the attendance policies that required her to call in before a shift started to report an absence from work, Plaintiff failed to appear or report an absence from work for the remaining four days of that week. Thames Dep. 183-184, 192, 376-377, 197, 380; DX 23-28.

38.   Following her February 12, 2003 shift, Plaintiff did not appear for work again until Monday, February 24, 2003. Pl. DX 23.

39.   Nevertheless, Plaintiff still received a raise on February 21, 2003. Thames

Dep. 194-96; DX 8.

40.     During her February 24, 2003 shift, Plaintiff Thames and Patterson, another

operations specialist, got into a verbal disagreement over Patterson's

remarks that Plaintiff Thames "must have been lying" about the sexual

harassment, had caused a lot of problems, and had "got [Patterson] in a lot

of trouble" by indicating that Patterson assisted Plaintiff Thames in reporting

the sexual harassment. [12]   Thames Dep. 258, 318-320, 339, 349-350, 359-

360.   Plaintiff Thames further alleges that Patterson stated that Plaintiff

Thames made her lose her friends on the job and that she [Patterson] was

probably going to lose her job.  Id.  In the dispute, Patterson allegedly told

Plaintiff Thames that "since all this mess" Patterson had been putting up

with her and that Patterson should not have sided with Plaintiff Thames or

said anything to help her.  Id.

41.     Mike Thompson was contacted by Plaintiff and came to the BAA to resolve

the dispute, which he did. Thames Dep.  338-43, 361.

42.     Thompson spoke with both Plaintiff and Patterson and asked them if they

---

[12] The Defendant alleges that Patterson and Plaintiff Thames got into a verbal disagreement over the fact that Plaintiff frequently left the operations area for extended time periods without notifying Patterson. Thames Dep. 348, 359, 365; Patterson Dec. ¶ 9. Patterson resented the fact that Plaintiff was constantly leaving her alone in the Operations office to monitor all the cameras by herself while Plaintiff rode around the premises with David Graham, another operations specialist. Thames Dep. 257, 348, 359; Patterson Dec. ¶ 9.

could put aside their differences and work together in a professional manner, which they agreed to do.  Thames Dep. 365, 374-75; DX 21; Thompson 33, 38.

43.  This was the last time that Plaintiff ever appeared for work. Thames Dep. 192-93, 197; DX 28, 30.

44.  Plaintiff was absent from work from Tuesday, February 25, 2003 through Friday, March 7, 2003. Thames Dep.  381-383; DX 26-28.

45.  During this time, she repeatedly failed to report off or otherwise notify BAA that she would not be at work (creating a hardship in staffing and requiring the BAA to find last minute coverage for her position). Thames Dep.  379-84; DX 25-29.

46.  When Mike Thompson called Plaintiff on February 26, 2003, to inquire about her absence the previous night, she informed him that she "would probably make [her] next shift".  Thames Dep. 193.  She still did not appear for work.[13]

---

[13] She testified as follows:

Q:   So as far as staffing through most of March, you decided to pretend as if you might return even though you…

A:   I didn't pretend. I never showed up for work after that. I didn't call. I didn't go. It wasn't pretending that I still worked there. I just did not submit a letter of resignation.

Q:   Well, your manager called and said, "Are you coming in?" on at least one or two occasions and you indicated you were and [then]didn't show up?

A:   He may have asked me that one time.

47.    As a result of her continued failure to appear for work, BAA concluded that

Plaintiff Thames had abandoned her job and sent her the appropriate

COBRA documents on March 7, 2003. Thames Dep. 385, Thames Dep. DX

30.

48.    At the time the BAA concluded that Plaintiff Thames had abandoned her

job, she had missed 17 of the last 20 days of work.[14]  Murray Dec. ¶ 16;

Thames Dep. DX 23.

49.    Plaintiff admits that the BAA should have fired her. Thames Dep. 387.[15]

50.    On her application for a subsequent employer (Enterprise) in St. Louis, and

in her phone interview, Plaintiff stated that her reason for leaving the BAA

Thames Dep. 191-92; DX 24.

[14] Stated differently, she had appeared for work only three days during the last month
of her employment. Murray Dec., ¶ 16; Pl. DX 23.

[15] She testified as follows:
Q:    You didn't expect The Airport Authority to keep holding your job, correct?
A:    I didn't expect them to. I didn't expect them —
Q:    In fact, you were paid for longer than you expected to be paid, correct?
A:    That's correct. I didn't expect to be continued as an employee after I left the first week.
Q:    After you left following Barbara Patterson?
A:    That's correct.
Q:    I guess the confrontation or incident with Barbara Patterson?
A:    When I just stopped showing up night after night after night.
Q:    They should have fired you?
A:    That's correct.
Q:    Why do you think they didn't fire you?
A:    I don't know. I'm not sure. I don't know why they wouldn't.
Thames Dep. 386-87.

was because she was relocating to St. Louis. Defendant's Exhibit I.

## IV.  Applicable Substantive Law and Analysis

Plaintiff claims sexual harassment and retaliation under Title VII, 42 U.S.C. 2000e, as amended by the Civil Rights Act of 1991, and 42 U.S.C. § 1981a.[16]  The Court is aware that the summary judgment rule applies in job discrimination cases just as in other cases.  See Chapman, 229 F.3d at 1025 (rejecting an earlier, contrary general rule and emphasizing that no thumb is to be placed on either side of the scale).

The analysis of the plaintiff's claims will be determined not only by the nature of the allegations but also by the quality of the evidence offered in support of those claims.  See Standard, 161 F.3d at 1330 (noting that "[t]he analytical framework and burden of production var[y] depending on the method of proof chosen").  In general, a plaintiff may attempt to establish a claim of illegal employment discrimination through the use of direct evidence, circumstantial (indirect) evidence, or statistics.  See id.; see also Schoenfeld v. Babbitt, 168 F.3d 1257, 1266 (11th Cir. 1999) (recognizing the availability of either direct or circumstantial evidence).  A plaintiff's ability to proceed through the use of

---

[16]The same framework used to analyze claims under Title VII is also employed in assessing claims of employment discrimination under § 1981.  See Standard v. A.B.E.L. Servs., Inc., 161 F.3d 1318, 1330 (11th Cir. 1998).

18

circumstantial evidence of discrimination is necessarily important because direct proof of discrimination is uncommon.  See Combs v. Plantation Patterns, 106 F.3d 1519, 1537 (11th Cir. 1997); Grigsby v. Reynolds Metals Co., 821 F.2d 590, 595 (11th Cir. 1987).  Direct evidence is "[s]uch evidence [which], if believed, proves the existence of a fact in issue without inference or presumption."  Burns v. Gadsden State Community College, 908 F.2d 1512 (11th Cir. 1990).  Cf. Wright v. Southland Corp., 187 F.3d 1287, 1293-94 (11th Cir. 1999) (per Tjoflat, J.) (defining direct evidence as "evidence from which a reasonable trier of fact could find, more probably than not, a causal link between an adverse employment action and a protected personal characteristic" and finding the outcomes reflected in prior case law consistent with that definition).

Here, Plaintiff has presented only circumstantial evidence of discrimination. "In evaluating [discrimination] claims supported by circumstantial evidence, [the courts of this circuit] use the now-familiar framework established by the United States Supreme Court in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973), and Texas Department of Community Affairs v. Burdine, 450 U.S. 248, 101 S. Ct. 1089, 67 L. Ed. 2d 207 (1981)." Combs, 106 F.3d at 1527.  Under the McDonnell Douglas and Burdine framework, the plaintiff first has the burden of establishing a prima facie case of discrimination, which

creates a rebuttable presumption that the employer acted illegally. See id. at 1527-28. The methods of presenting a prima facie case, as well as the exact elements of the case, are not fixed; rather, they are flexible and depend to a large degree upon the facts of the particular situation.   See, e.g., Nix v. WLCY Radio/Rahall Communications, 738 F.2d 1181, 1185 (11th Cir. 1984); Lincoln v. Board of Regents of Univ. Sys., 697 F.2d 928, 937 (11th Cir. 1983).  In general, a plaintiff establishes a prima facie case of disparate treatment employment discrimination by showing that he or she was a qualified member of a protected class and was subjected to an adverse employment action but that otherwise similarly situated employees outside the plaintiff's class were treated dissimilarly.[17] See McDonnell Douglas, 411 U.S. at 802 (hiring); Holifield v. Reno, 115 F.3d 1555, 1562 (11th Cir. 1997) (discipline); see also Nix, 738 F.2d at 1185 (discipline); Pittman v. Hattiesburg Mun. Separate Sch. Dist., 644 F.2d 1071, 1074 (5th Cir. 1981) (wages).

Once the plaintiff has shown a prima facie case and, thereby, has created the presumption of discrimination, the burden of production shifts to the employer to

---

[17]See also McDonnell Douglas, 411 U.S. at 802 n.13 (observing that "[t]he facts necessary will vary in Title VII cases, and the specification above of the prima facie proof required from respondent is not applicable in every respect in different factual situations").

articulate a legitimate, nondiscriminatory reason for its actions.[18]  See Combs, 106 F.3d at 1528.  The employer "need not persuade the court that it was actually motivated by the proffered reasons."  Burdine, 450 U.S. at 254-55; see Chapman, 229 F.3d at 1024.  If the employer satisfies that burden by articulating one or more such reasons, then the presumption of discrimination drops out of the case and the burden of production again shifts to the plaintiff to offer evidence sufficient for a reasonable jury to conclude that the employer's supposedly legitimate reason is merely a pretext for illegal discrimination.[19]  Where the defendant articulates multiple  reasonable, legitimate, and nondiscriminatory reasons, plaintiff must rebut each of defendant's proffered reasons.  See Chapman, 229 F.3d at 1024-25.  Although the prima facie case is irrelevant once the employer has offered a legitimate reason for its actions, the evidence of pretext may include the same evidence offered to establish the prima facie case.  See Combs, 106 F.3d at 1528.

Despite this shifting of the burden of production between the plaintiff and the defendant under the McDonnell Douglas and Burdine framework, "[t]he ultimate burden of persuading the trier of fact that the defendant intentionally

---

[18]See Chapman, 229 F.3d at 1034 (stating that "[a] subjective reason is a legally sufficient, legitimate, nondiscriminatory reason if the defendant articulates a clear and reasonably specific factual basis upon which it based its subjective opinion").

[19]If the proffered reason is one that might motivate a reasonable employer, a plaintiff cannot recast the reason but must meet it head on and rebut it.  Simply quarreling with that reason is not sufficient.  Chapman, 229 F.3d at 1030.

discriminated against the plaintiff remains at all times with the plaintiff." Burdine,

450 U.S. at 253. Given that the ultimate burden of persuasion always lies with the

employee, a plaintiff may prevail on an employment discrimination claim and may

also defeat a summary judgment motion either by proving that intentional

discrimination did indeed motivate the defendant or by producing sufficient

evidence to allow a rational trier of fact to disbelieve the employer's proffered

legitimate reasons, thus permitting but not compelling the trier of fact to make a

finding of illegal discrimination. See Reeves v. Sanderson Plumbing Prods., Inc.,

530 U.S. 133, 146-49, 120 S. Ct. 2097, 2108-09 (2000) (pointing out that the

production of the necessary sufficient evidence by plaintiff will not always prevent

the employer from prevailing on a Rule 50 motion and suggesting that the strength

of plaintiff's prima facie case, the probative value of the proof that the employer's

explanation is false, and any other properly considered evidence that supports the

employer's case are among other factors to take into account in evaluating a Rule

50 motion);[20] St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502 (1993); Abel v.

Dubberly, 210 F.3d 1334, 1339 (11th Cir. 2000); Alexander v. Fulton County, 207

F.3d 1303, 1336 (11th Cir. 2000); Combs, 106 F.3d at 1529-38 (interpreting Hicks

and the post-Hicks case law); Hairston v. Gainesville Sun Publ'g Co., 9 F.3d 913,

---

[20]The court in Chapman modified the statement in Combs contrary to this holding in
Reeves after noting that the standard for granting summary judgment mirrors the standard for
judgment as a matter of law. See Chapman, 229 F.3d at 1025, n.11.

22

920-21 (11th Cir. 1993).

## A.  **Sexual Harassment**

Plaintiff alleges that she was subjected to unwelcome acts of sexual harassment by her immediate supervisor, Nathaniel Henderson, an employee of the Defendant.[21]   The alleged sexual harassment of Plaintiff Thames by Henderson included, but was not limited to, the following: Henderson repeatedly asked Plaintiff Thames to go out with him; Henderson told Plaintiff Thames that he was attracted to her and that he loved her; Henderson told Plaintiff he could make her job "easy" or "hard" depending on her reactions to his overtures; Henderson repeatedly called Plaintiff in his office and propositioned her; Henderson backed Plaintiff Thames into a corner in his office and asked what she would do if he grabbed her and kissed her; and he told her that he was taking care of other female employees of the Defendant.  DX 15.

To establish a sexual harassment hostile work environment claim under Title VII, Plaintiff must show that: (1) she belongs to a protected group; (2) she was subjected to unwelcome sexual harassment; (3) the harassment was based on her sex; (4) the harassment was sufficiently severe or pervasive to alter the terms, conditions, or privileges of her employment; and (5) there is a basis for holding the

---

[21] Plaintiff is asserting only a hostile work environment claim and admits that she is not asserting a claim for quid pro quo sexual harassment.  Thames Dep. 207.

employer liable. See Gupta v. Florida Bd. of Regents, 212 F.3d 571, 582 (11th Cir. 2000); Walton v. Johnson & Johnson Services, Inc., 347 F.3d 1272, 1280 (11th Cir. 2003); Mendoza v. Borden, Inc., 195 F.3d 1238, 1245 (11th Cir. 1999).

Plaintiff Thames is a member of the protected class under Title VII: she is a female. She has provided evidence that she was subjected to unwelcome sexual harassment and the harassment was based on her sex. The Defendant asserts that Plaintiff Thames has failed to establish a prima facie case of sexual harassment because the harassment was not sufficiently severe or pervasive. Even if Plaintiff Thames can demonstrate that the harassment was severe or pervasive, BAA has asserted a Faragher/Ellerth affirmative defense. In order "to be actionable under [Title VII], a sexually objectionable environment must be both objectively and subjectively offensive, one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so." Faragher v. City of Boca Raton, 118 S.Ct. 2275, 2283 (1998). In determining whether an environment is sufficiently hostile or abusive, courts should consider all circumstances, including: 1) the frequency of the conduct; 2) its severity; 3) whether it is physically threatening or humiliating, or a mere offensive utterance; and 4) whether it unreasonably interferes with an employee's work performance. Id. at 2283.

Plaintiff Thames has presented evidence of several sexually harassing and offensive incidents to which she was subjected by Henderson, including but not

limited to Henderson's making sexually inappropriate comments to her, his discussion of his sexual prowess, his comments to Plaintiff that he was attracted to her and couldn't control himself, his attempt to kiss her, his offer to give her money, his request that she ride alone with him on an air field,[22] his grabbing of her hand and touching of her leg while on one of these rides, and his attempt to physically corner her in his office and proposition the Plaintiff, his questioning of her interaction with male co-workers, his demonstration of anger if she interacted with her male co-workers, his frequent questions to her of why she was playing "hard to get", his frequent comments to her that he was in love with her, his comments to her about sex with his wife, his comments to her about what he could do sexually and that he could "go all night" and was a "good lover".  Thames Dep. 171-174, 203-205, 206-207, 230-231, 235-237, 239-240, 242-244, 250, 254-256, 271-277, 280-281, 284-286, 301-302, 412-418; Ex. 12, 13, 14; Henderson Dep. 127, Ex. 20.   Plaintiff also provided evidence that on December 14, 2002, Henderson cornered the Plaintiff in the break room.  Thames Dep. 210-212, 216, 285-286, 414-418; Ex. 14; Henderson Dep. 127, Ex. 20.  While pushing her against the coffee machine with his body against hers, he asked her why she avoided him and would not go out with him.  Id.  He allegedly told her that loved her.  Id.

---

[22] Plaintiff alleges that Henderson would proposition her while she was out on the air field with him.

25

Plaintiff was allegedly crying and told him that she would scream.  Thames Dep. 212, 286; Henderson Dep. 127; Ex. 20.  He then left.  Id.

Although Title VII is not a "general civility code" and the prohibition against harassment in the workplace does not prohibit "intersexual flirtation" as held in Oncale v. Sundowner Offshore Serv. Inc., 523 U.S. 75, 118 S.Ct. 998, 1003 (1998), the evidence provided by Plaintiff Thames does not just constitute workplace "flirtation" as characterized by the Defendant.  Further, the Eleventh Circuit held that pervasiveness involves inquiry into the effect of incidents of harassment, and is not merely a matter of counting the number of incidents.  Vance v. Southern Bell Telephone and Telegraph Company, 863 F.2d 1503, 1510; see also Carrero v. New York City Housing Authority, 890 F.2d 569, 578 (2nd Cir. 1989)("The offensiveness of the individual actions complained of is also a factor to be considered in determining whether such actions are pervasive.")

In addition, the Plaintiff presented evidence that she was humiliated in the workplace, dreaded going to work, afraid to be alone with Henderson, developed welts all over her body during the time of the alleged harassment,  and was given two days off in January 2003, due to her nervous condition.  Plaintiff Thames provided evidence that Wells, Plaintiff's coworker, noticed that Plaintiff Thames was "real nervous" and quiet when Henderson would "come around," that Henderson had a practice of unexpectedly returning to the third shift after his shift

had ended, and returning to the third shift without swiping his identification badge. The Court finds that Plaintiff has presented sufficient evidence to raise genuine issues of material fact as to whether the alleged harassment was sufficiently severe or pervasive to alter the terms and conditions of employment and create an abusive working environment.

The Plaintiff has demonstrated that there is a basis for holding the employer liable. Henderson, a BAA employee, was working in his capacity as Plaintiff Thames's supervisor during the period of the alleged sexual harassment. An employer is subject to vicarious liability under Title VII to a victimized employee for actionable discrimination caused by a supervisor. Faragher v. City of Boca Raton, 524 U.S. 775(1998); Burlington Industries, Inc. V. Ellerth, 524 U.S. 742 (1998). However, an employer may invoke an affirmative defense to avoid liability. The Defendant asserts that there is no basis for holding BAA liable for Henderson's alleged conduct because it has satisfied the affirmative defense. The Faragher/Ellerth affirmative defense allows an employer to avoid liability for a supervisor's sexual harassment of an employee by proving that: 1) it exercised reasonable care in preventing and promptly correcting any sexually harassing behavior; and 2) the plaintiff unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise. See Faragher, 524 U.S. at 807; Walton, 347 F.3d at 1286; Madray v.

Publix Supermarkets, Inc., 208 F.3d 1290, 1296-1297 (11th Cir. 2000).

In determining whether an employer can establish the affirmative defense, the court must first determine "whether the employer has exercised reasonable care in preventing sexually harassing behavior." Walton, 347 F.3d at 1286; Coates, 164 F.3d at 1369. The Court in Faragher "implied that employers could meet the initial burden in determining whether they had exercised reasonable care to prevent sexual harassment by promulgating a sexual harassment policy." Madray, 208 F.3d at 1297-98. In fact, dissemination of an employer's anti-harassment policy clearly satisfies the requirement for exercising reasonable care in preventing sexual harassment. Id. BAA asserts that it prohibits sexual harassment in the workplace and has provided employees with a policy and complaint mechanism to report any perceived harassing behavior, which Plaintiff herself utilized. (Williams Dec. ¶ 3). This policy was routinely disseminated to all new employees upon hire. (Hardy Dec. ¶ 6, Lavender Dec. ¶ 6, Wells Dec. ¶ 2, Williams Dec. ¶ 3, and Patterson Dec. ¶ 8).

Plaintiff contends that she did not receive the sexual harassment policy. Although BAA has demonstrated that it has a sexual harassment policy in place, the Eleventh Circuit has made it clear in Frederick v. Sprint/United Management Co., that "an employer's showing that it has a sexual harassment policy does not automatically satisfy its burden" on the first element. 246 F.3d 1305, 1313-14 (11th

28

Cir.200).  The employer must also show "that its sexual harassment policy was effectively published, that it contained reasonable complaint procedures, and that it contained no other fatal defect." Id.  Although the Defendant provided evidence that it had a sexual harassment policy and there were reasonable complaint procedures including access to an EAP counselor, Plaintiff Thames presented evidence that the Defendant's sexual harassment policy was not effectively published.  Plaintiff Thames testified that she could not initially locate the policy manual in the operations office.  Thames Dep. 153-159.  In addition, there was no sexual harassment policy posted within the operations area or break room.  Thames Dep. 168.  It is undisputed that Plaintiff's alleged harasser, Henderson was unaware of Defendant's sexual harassment policy and that he had not been trained about it.  Henderson Dep. 77-80.  To hold that an employer has met its Faragher/Ellerth obligation by disseminating its anti-harassment policy to the alleged victim of sexual harassment, even though the alleged harasser undisputedly was unaware of the policy, is contrary to the statute's goal of preventing the alleged sexual harassment.  This Court declines to so hold.  It is clear from the law of this Circuit that "'dissemination of an employer's anti-harassment policy [is] fundamental to meeting the requirement of exercising reasonable care in preventing sexual harassment.'" Walton, 347 F.3d at 1286, quoting Madray, 208 F.3d at 1297-98.  "Dissemination" includes disseminating to

29

the alleged harasser, and not just to the alleged victim.  Thus, the Defendant has failed to satisfy the first prong of its Faragher/Ellerth affirmative defense.

Under the second prong of the affirmative defense, BAA must show that Plaintiff unreasonably failed to avail herself of the corrective or preventive opportunities provided by BAA or to avoid harm otherwise.  Faragher, 524 U.S. at 807; Burlington v. Ellerth, 524 U.S. 742, 763, 118 S.Ct. 2257, 2270, 141 L.Ed.2d 633 (1998). The Supreme Court expressly stated that "unreasonable failure to use any complaint procedure provided by the employer...will normally suffice to satisfy the employer's burden under the second element of the defense." Burlington, 118 S.Ct. at 2270. (emphasis added).  The Defendant alleges it has satisfied the elements of the affirmative defense because the Plaintiff delayed reporting the alleged harassment and utilizing the complaint procedure.

It is undisputed that Plaintiff made reports of sexual harassment and related retaliation on December 16, 2002, and on January 3, 2003.  A failure to use the complaint procedure must be "unreasonable" in order for the employer to meet its burden.  Faragher, 524 U.S. at 807-08.  The Eleventh Circuit has established that "in some cases, the proof will show that the employee's non-compliance was reasonable under the circumstances and, in these cases, the defendant cannot satisfy the second element of the affirmative defense."  Frederick, 246 F.3d at

1314.[23]  In the present case, Plaintiff has testified that she never received a sexual harassment policy, never saw a policy posted, had no training on a policy, and did not know what to do about the sexual harassment by Henderson.  Further, Plaintiff testified that Murray informed her that she could not guarantee Plaintiff's safety. The Court finds that there is a genuine issue of material fact as to whether the Plaintiff's delay in reporting the alleged harassment resulted in her reasonably failing to avail herself of the corrective or preventive opportunities provided by BAA.

In order to assert the Faragher/Ellerth affirmative defense, a defendant must establish that it has met both prongs of the defense.  See Walton, 347 F.3d 1272. As the Defendant has failed to meet either prong of its affirmative defense the Court finds that the Defendant's motion for summary judgment should be denied as to Plaintiff's harassment claim.

## B.  Alabama Code §4-3-50

The Defendant asserts that Plaintiff's sexual harassment claim should be dismissed because Alabama Code §4-3-50 prohibits civil actions against Airport

---

[23] In Frederick, the Court held summary judgment was inappropriate on the issue of whether the plaintiff's delay in reporting the harassment was reasonable, where the plaintiff testified she never received some of the defendant's sexual harassment policies, the procedure for reporting harassment was unclear in the policy she did receive, and a manager to whom she tried to complain about the harassment told her not to pursue her complaint.  246 F.3d at 1315-16. Similarly, other courts in this Circuit have denied summary judgment on this issue where the plaintiff was unaware of the employer's sexual harassment policy.  See Early v. Morris Newspaper Corp., 54 F.Supp. 2d 1261, 1270 (M.D. Ala 1999).

Authorities for negligence. The Defendant asserts that Plaintiff's harassment claim is premised upon her belief that BAA "knew or should have known about the harassment, but failed to take prompt and effective remedial action" (Complaint at ¶ 19). The Defendant asserts that Plaintiff alleges that BAA somehow failed to adequately communicate its harassment policy and/or that it failed to take adequate measures against Henderson. Thames Dep. 154, 159, 327-28, and that, therefore BAA acted <u>negligently</u> in not preventing or correcting the harassment. Alabama Code § 4-3-50, prohibits civil actions against Airport Authorities for negligence. <u>See e.g.</u>, <u>Jordan v</u>. <u>Continental Airlines, Inc.</u>, 893 So.2d 446 (Ala. Civ. App. 2004)(dismissing negligence claim against the BAA pursuant to Alabama Code § 4-3-50). Specifically, the statute states:

> No civil action shall be brought or maintained against the authority or any director thereof for or <u>on account of the negligence of such authority</u> or director or its or his agents, servants or employees <u>in or about the</u> construction, maintenance, operation, superintendence or <u>management</u> of any airport, heliport or other facility owned by the authority.

Alabama Code § 4-3-50 (1975)(emphasis added).

Plaintiff asserts that, contrary to the BAA's claim, the Plaintiff has not asserted a Title VII claim in "negligence." Count One of Plaintiff's complaint clearly sets forth that "all discrimination and retaliation was done willfully and with malicious and reckless disregard..." (Complaint at ¶21). Further, even if

Plaintiff's Title VII claims could be construed as negligence claims, 42 U.S.C. §2000e-7[24] preempts any bar to relief presented by Alabama Code § 4-3-50 (1975).

The Court finds that 42 U.S.C. §2000e-7 preempts any bar to relief presented by Alabama Code § 4-3-50 (1975). Therefore, Plaintiff Thames's sexual harassment claim is not barred by Alabama Code § 4-3-50 (1975).

## C. **Retaliation Claim**

The Plaintiff alleges in her complaint that, after she reported a claim of sexual harassment to BAA's human resources, the Defendant retaliated against her by subjecting her to ridicule by her co-workers and employees of the Defendant and constructively discharging her in March 2003.[25] The Defendant asserts that: (1) Plaintiff Thames did not sustain an adverse employment action because she was not constructively discharged; (2) even if Plaintiff Thames was constructively discharged and suffered an adverse employment action, Plaintiff Thames fails to

---

[24] 42 U.S.C. §2000e-7 provides, "Nothing in this subchapter shall be deemed to exempt or relieve any person from any liability, duty, penalty, or punishment provided by any present or future law of any State or political subdivision of a State, other than any such law which purports to require or permit the doing of any act which would be an unlawful employment practice under this subchapter." See also, LeBlanc v. Southern Bell Tel. & Tel. Co., 333 F.Supp. 602 (E.D. La. 1971), aff'd 460 F.2d 1228, cert denied 93 S.Ct. 320, 409 U.S. 990, 34 L.Ed.2d 257 (the intent of §2000e-7 is not to save those state laws which require what is an unlawful employment practice under this subchapter); and Ridinger v. General Motors Corp., 325 F.Supp. 1089 (S.D. Ohio 1971)(Congress intended to supersede all provisions of state law which permit doing of an act which constitutes unlawful employment practice under this subchapter or which are inconsistent with any purpose of this subchapter).

[25] Plaintiff admits that her retaliation claim is based only on the two incidents where her co-workers allegedly called her a "liar" and "troublemaker" and the Patterson altercation. Thames Dep. 375, 399. She further admits that the only two claims she is making in this case are sexual harassment and retaliation. Thames Dep. 412.

allege that she suffered an adverse employment action causally connected to any protected activity; and (3) all of the Defendant's proferred reasons for its employment decisions were taken for legitimate non-retaliatory reasons.

Generally, to establish a prima facie case of retaliation, a plaintiff must show:  (1) that [she] engaged in protected activity; (2) that [her] employer was aware of that activity; (3) that  [she] suffered an adverse employment action; and (4) that there was a causal link between [her] protected activity and the adverse employment action.  Maniccia v. Brown, 171 F.3d 1364, 1369 (11th Cir. 1999) (citing Little v. United Techs., 103 F.3d 956, 959 (11th Cir. 1997)).  The causal link requirement is to be construed broadly, and the Eleventh Circuit Court of Appeals has stated that "a plaintiff merely has to prove that the protected activity and the negative employment action are not completely unrelated."  Id. at 1460, quoting EEOC v. Reichhold Chem., Inc., 988 F.2d 1564, 1571-72 (11th Cir. 1993). The allocation of the evidentiary burdens will be determined by whether the evidence for establishing the retaliation claim is characterized as "direct" or "circumstantial" evidence.

Plaintiff Thames engaged in protected activity when she reported a claim of sexual harassment to the human resources department of BAA on December 16, 2002. Complaint at ¶12.  It is undisputed that BAA was aware of Plaintiff

Thames's claim of sexual harassment.[26]   The Defendant alleges that Plaintiff Thames did not suffer an adverse employment action because Plaintiff Thames was not constructively discharged by BAA.   "To successfully claim constructive discharge, a plaintiff must demonstrate that working conditions were 'so intolerable that a reasonable person in [her] position would have been compelled to resign.'" Hipp v. Liberty Nat'l Life Ins. Co., 252 F.3d 1208, 1231 (11th Cir. 2001); Morgan v. Ford, 6 F.3d 750, 755-56 (11th Cir. 1993).   Further, the Defendant alleges that Plaintiff Thames quit her position because she wanted to relocate to St. Louis to be closer to her husband's family.

In Davis v. Town of Lake Park, Florida, 245 F.3d 1232 (11th Cir. 2001), the Eleventh Circuit established a standard for determining whether an employment action is adverse.   The Court held that to prove adverse employment action in a case under Title VII's anti-discrimination clause, an employee must show a serious and material change in the terms, conditions, or privileges of employment.   245 F.3d at 1239.   Moreover, the employee's subjective view of the significance and adversity of the employer's action is not controlling; the employment action must be materially adverse as viewed by a reasonable person in the circumstances. Id.

---

[26] The alleged harasser and several of her co-workers were also cognizant of Plaintiff Thames's report of sexual harassment.

Plaintiff Thames has provided evidence that the conditions of her employment changed after she complained about sexual harassment to BAA's human resources department.  She provided evidence that she was shunned, rejected, and teased and experienced altercations with other female co-workers because she filed her complaint.  Her co-workers allegedly called her a "liar" and a "troublemaker".[27]   Thames Dep. DX 19.  On or about February 25, 2003, Plaintiff Thames had an additional altercation with Patterson.  Thames Dep. 360-361.  Plaintiff Thames testified that the altercation became very "heated" and, in addition to Plaintiff and Patterson yelling at each other, Patterson threatened to hit Plaintiff Thames and "knock [her] down.  Id.  As a result of the altercations with co-workers, Plaintiff Thames testified that she hated going to work, felt that her physical safety and the safety of her unborn child was threatened, and she developed welts all over her body during this time period.  Thames Dep. 193-194, 389-390, 394, 399-400.  In addition, Plaintiff presented evidence that she was given two days off in January 2003, and sent home early on February 25, 2003, due to her nervous condition after being physically threatened by a co-worker.  Id. After the February 25, 2003, incident with Patterson, Plaintiff Thames stopped

---

[27] On or about February 7, 2003, Plaintiff Thames alleges that she had an argument with Ella Hardy after Ella made comments about Plaintiff Thames starting a "mess" at the airport, being a "little troublemaker", and that Plaintiff Thames had "started all this trouble."  Thames Dep. 333-334, 336, 341.  Plaintiff also alleges that Patterson told her that she was a "troublemaker" and a "liar" and Patterson had lost a lot of friends because she had sided with Plaintiff Thames.  Thames Dep. 339-341.

going to work because she believed it was not safe to continue working at BAA. Thames Dep. 33, 186-187, 190-191, 399-400.  Around this same time, Plaintiff and her husband decided to move to St. Louis. Thames Dep.  191.  The Eleventh Circuit has held that a constructive discharge qualifies as an adverse employment action.  Poole v. Country Club of Columbus, Inc., 129 F.3d 551, 553 (11th Cir. 1997).

The Defendant alleges that Plaintiff Thames's working conditions were not so intolerable that a reasonable person would be forced to resign.  The Defendant provided evidence that a memorandum was distributed to all employees reminding them of the confidentiality of investigations and that retaliatory conduct would not be tolerated. [28] Thames Dep. 368; DX 22.  Further, the Defendant alleges that Plaintiff Thames voluntarily quit her position because she wanted to relocate to St. Louis to be closer to her husband's family.  The Court finds that Plaintiff Thames has presented sufficient evidence to raise a genuine issue of material fact as to whether she was constructively discharged and subjected to retaliation for filing a sexual harassment complaint.  Accordingly, the Defendant's motion for summary judgment as to Plaintiff Thames's retaliation claim should be denied.

---

[28]The memorandum was distributed approximately a month after Plaintiff Thames filed a complaint of retaliation with the human resources department.

### V. Conclusion

For the reasons set forth above, the Court denies the Defendant's motion for summary judgment as to Plaintiff's harassment and retaliation claims.

**DONE** and **ORDERED** this 5th day of July, 2005.

**VIRGINIA EMERSON HOPKINS**
**United States District Judge**